UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Susan Harris,                                    Civil No. 05-645 (JMR/FLN)

          Plaintiff,

          v.                                     **REPORT AND**
                                                 **RECOMMENDATION**

The City of Wabasha,
Peter Klas, Mayor of the City of Wabasha,
in both his individual and official capacities;
David Kruger, Police Chief for the City of
Wabasha, in both his individual and official
capacities; and EagleWatch, Inc., a
Minnesota nonprofit corporation.

          Defendants.

_____

William Mavity, for Plaintiff.
Peter Regnier for Defendants City of Wabasha and David Kruger
Jeff Zalasky for Defendant Peter Klas.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on August

4, 2006, on Plaintiff's Motion for Partial Summary Judgment [#63]; Defendant Peter Klas' Motion

for Summary Judgment [#68]; and Defendants City of Wabasha and David Kruger's Motion for

Summary Judgment [#80].   These matters were referred to the undersigned for Report and

Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons which follow,

this Court recommends Plaintiff's Motion be denied, and that Defendant Peter Klas' Motion, and

Defendant City of Wabasha and David Kruger's Motion be granted in part and denied in part.

## I.    FINDINGS OF FACT

Plaintiff Susan Harris (hereinafter "Harris") was hired in the spring of 2002 as a paid

employee of EagleWatch, Inc., ("EagleWatch") a nonprofit organization that operates the National

Eagle Center ("NEC") in Wabasha, Minnesota.  (Affidavit of Pierre Regnier (hereinafter "Regnier Aff.") Ex. 16 at 106.)  Harris' duties required her to manage the gift store and assist in the operations of the NEC.

In 2003 and 2004, approximately 20 percent to 25 percent of the budget for the NEC came from funds given to NEC by the City of Wabasha (hereinafter "City").  (Regnier Aff. Ex. 1 at 317.) The Wabasha City Council (hereinafter "City Council") passed a Resolution on January 30, 2003, wherein the City agreed "that in order to obtain a grant from the State of Minnesota, the City . . . will guarantee that any operating costs exceeding the revenue of the [NEC] will be provided by the City." (Regnier Aff. Ex. 2.)  Klas testified that the Resolution came about because the State of Minnesota gave the City a grant for $500,000 to build the National Eagle Center building, and then the grant was canceled by the State.  (Affidavit of Jeff Zalasky ("Zalasky Aff.") Ex. F at 78.)  Klas testified that, in order to have the grant reinstated, the State insisted that the City "become actively involved and actually own the building and that the [C]ity would underwrite the cost."  (Zalasky Aff. Ex. F at 78.)  Klas testified that the State agreed to give the City the $500,000 grant, but only if the City guaranteed it, and by signing the Resolution the City was telling the State that the City was agreeing to do just that. (Zalasky Aff. Ex. F at 78.)  On July 8, 2003, the City, through its Wabasha Economic Development Authority (hereinafter "EDA"), also agreed to pay EagleWatch $100,000 in four installment payments of $25,000 each.  (Regnier Aff. Ex. 3.)  At all times the President of the EDA, Jon Lineweaver (hereinafter "Lineweaver"), was a nonvoting member of the Board of Directors of EagleWatch (hereinafter "Board").  (Am. Compl. ¶ 3.)  Klas sat in on Board meetings, but he was not a member of the Board, nor was he an ex officio member.  (Zalasky Aff. Ex. A at 41-42.)

In June 2003, while Harris was employed at the NEC, a burglary occurred at the NEC.

Money was taken from a file cabinet located in Harris' office, and Wabasha Chief of Police David Kruger (hereinafter "Kruger") suspected that the burglary was perpetrated by employees or others closely associated with EagleWatch. (Affidavit of David Kruger (hereinafter "Kruger Aff.") ¶¶4-5.) Three employees, including Harris, were suspected as likely participants in the crime, and were interviewed by Kruger on November 25, 2003. (Kruger Aff. ¶6.)    Harris was asked to take a computer voice stress analyzer ("CVSA") test and did so on December 1, 2003. (Kruger Aff. ¶7.)

On December 8, 2003, Kruger conducted another interrogation of Harris. (Kruger Aff. ¶8; Am. Compl. ¶ 12.) During this interrogation Harris was informed by Detective Curt Struwe that the CVSA showed that when Detective Struwe asked Harris "about prying a door open, and taking the money, there's lie and deception." (Kruger Aff., Ex. A at 3.)[1] During this interrogation Kruger also informed Harris that he had "a problem with the investigation [that] lead us up to bringing you here and placing you on this and . . . this shows that the deception is still a problem." (Kruger Aff., Ex. A p. 25.) Plaintiff testified that she "was not told by anyone at the police department that [she] failed the CVSA." (Zalasky Aff. Ex. C at 79.) In addition, during the interrogation Harris stated "right now I've got three shirts that are sitting there that I haven't paid for yet . . . the blue shirt I wear I haven't paid for to this day. But that's in the register that I haven't paid for it . . . there's a running receipt on how much I owe for those when we do get paid." (Kruger Aff. Ex. A at 5.) Plaintiff further stated "I've got three shirts. A necklace that I paid for but the darn slip sat in the cash register drawer till I did." (Kruger Aff. Ex. A at 14.) When asked why she had not paid for the shirts, Plaintiff replied "cus we haven't been paid. They're brand new shirts that just came in.

---

[1] Exhibit A refers to this interview as occurring on September 8, 2003; however, Kruger testified in his affidavit that the interview actually occurred on December 8, 2003. (Kruger Aff. ¶10.)

We've only had them a month."  (Kruger Aff. Ex. A at 16.)  Plaintiff further stated "we all have shirts that we've gotten right now and until we get paid it's a clear understanding that . . . we can have them."  (Kruger Aff. Ex. A at 17.)

On December 9, 2003, Harris and the two other suspected employees, MaryBeth Garrigan (hereinafter "Garrigan") and Sandy Runningen (hereinafter "Runningen"), sent a letter to Kruger regarding the investigation of the NEC burglary.  (Regnier Aff. Ex. 5.)  This letter was also sent to Defendant Mayor Peter Klas (hereinafter "Klas") and City Council President Lineweaver.  (Regnier Aff. Ex. 5.)  In this letter Harris and the other employees requested that they each be given copies of their individual test results concerning the CVSA so that they could have the results examined by their own experts.  (Regnier Aff. Ex. 5.)  The letter also informed Kruger that any further communications with the three employees should be submitted to them in writing.  (Regnier Aff. Ex. 5.)

On December 19, 2003, Harris, Garrigan and Runningen sent another letter to Kruger and copied the Board, Klas, Lineweaver, the Wabasha City Attorney and the Wabasha City Administrator.  (Regnier Aff. Ex. 9.)  In that letter they advised that all three had taken a lie detector test, that they believed that the CVSA "vindicated all of us," that they would not take any additional lie detector tests, and that any remaining questions were to be submitted to them in writing. (Regnier Aff. Ex. 9.)

On March 8, 2004, Harris alleges that, at a meeting of the Board, Klas asked the Board to go into a closed meeting without any staff or Executive Director Garrigan present, so that he could provide the Board with information regarding certain staffing issues.  (Am. Compl. ¶16.)  Plaintiff alleges that, during the closed portion of the Board meeting, Klas stated the following:

> What I am going to tell you does not leave this room.  I have been told that of the three people who took the lie detector test, only Sandy [Runningen] passed; Sue [Harris] and MaryBeth [Garrigan] failed the test, and 'Sue failed miserably.'  Before coming to the NEC, Sue was involved in missing funds at the VFW.  As long as I am Mayor, I will not let the City put any money into the NEC as long as Sue is here.

(Am. Compl. ¶17.)

On March 16, 2004, James Stokes (hereinafter "Stokes"), the President of EagleWatch, sent Harris a letter notifying her that her position at the NEC would be eliminated on March 31, 2004. (Regnier Aff. Ex. 11.)   This letter stated that "[t]he severe shortage of finances has caused EagleWatch, Inc. to reduce the number and type of paid positions at the [NEC]."  (Regnier Aff. Ex. 11.)  Plaintiff alleges that her employment was terminated by the Board because "of her refusal to take a second lie detector test."  (Am. Compl. ¶ 19.)  Plaintiff alleges that, during Board meetings in June and July, 2004, Klas said that Plaintiff should only be re-hired if she took a polygraph test. (Am. Compl. ¶ 21.)

In October, 2004, there was an opening for a position at the NEC.  Harris applied for the position along with other applicants and another applicant was chosen by the Board for the job. Plaintiff alleges that, at the October meeting of the Board, all non-Board members were asked to leave the meeting before the vote was taken.  Plaintiff alleges that, as he was leaving the meeting, Klas told the Board "you know what my feelings are about this."  (Am. Compl. ¶ 23.)

In Count I, Plaintiff alleges that "[a]t a March, 2004, meeting of the board of directors of EagleWatch, Inc., Defendant Klas told those Directors in attendance that plaintiff had taken a voice stress analysis test conducted by the police department and that plaintiff had failed said test."  (Am. Compl. ¶ 28.)  In Count I Plaintiff further alleges that "[o]n numerous occasions following the March, 2004 meeting, defendant Klas told EagleWatch board members and others that plaintiff had

failed the lie detector test, that she should not be allowed to work for the [NEC], and that plaintiff had been involved in 'missing funds' when she was an employee at the local VFW."  (Am. Compl. ¶ 29.)  Plaintiff further alleges that "[o]n several occasions in 2004 and 2005 Kruger told City Council members that plaintiff had failed the lie detector test and made statements to Council member Gallenberger implying that when questioned about the NEC burglary, plaintiff admitted to stealing items from the NEC."  (Am. Compl. ¶ 30.)  Plaintiff alleges that all of the statements by Klas and Kruger were false and defamatory, they tended to harm her reputation, they accused Harris of directly or indirectly committing a crime and were therefore *defamation per se*, that they were made in bad faith and with malice, and that Harris suffered substantial emotional distress and economic loss as a result of these statements.  (Am. Compl. ¶ 31.)

In Count II Harris alleges a claim for malicious wrong against Klas and the City.  Harris alleges that

> [t]he conduct of . . . Klas and the City . . . constituted a direct invasion of the plaintiff's rights and/or willful, wanton, or malicious conduct, which was the direct and proximate cause of emotional harm and distress and economic loss to the plaintiff, for which the defendants Klas and the City . . . are jointly and severally liable to the plaintiff for compensatory and punitive damages in such amounts as may be determined at trial.

(Am. Compl. ¶ 38.)  Harris further alleges that "[b]y his statement . . . Klas intended to injure plaintiff and succeeded in his malicious intent.  Defendant Klas' malicious conduct was the direct and proximate cause of plaintiff's injuries."  (Am. Compl. ¶39.)

In Count III, Harris alleges a claim against all three Defendants for "[n]egligent and/or [i]ntentional [i]nfliction of [e]motional [d]istress."  (Am. Compl. ¶ 40.)  In Count VI[2] Harris alleges

---

[2] In Counts IV and V Harris alleges claims against EagleWatch.  These claims are not the subject of any of the foregoing motions for summary judgment.

a claim against the City for violation of the Government Data Practices Act, Minn. Stat. § 13.82.

Harris alleges that the City, "through the actions of its Mayor, defendant Klas, disclosed to others,

including the Board . . . and other Wabasha City Council Members, confidential and nonpublic

criminal investigative data, specifically, the results of the voice stress analysis testing of plaintiff

by its police department." (Am. Compl. ¶ 47.)

     In her complaint, Plaintiff also alleges that, in 2005, she obtained a new position as a

bartender at the American Legion Club in Kellogg, Minnesota, and that Kruger told a Wabasha

Police Officer and Mary Murphy, Harris' supervisor, that Harris made an illegal sale of liquor to

persons under the age of 21 while working there. (Am. Compl. ¶ 26.)

     On April 6, 2005, Harris submitted a news release to the Wabasha County Herald wherein

she admitted that she was told she failed the CVSA test by Kruger. (Regnier Aff. Ex. 13.) However,

Plaintiff testified that this statement in the news release was "a false statement" but admitted that

she did not tell her "attorney that [it] was a false statement before he submitted [the statement] for

a news release." (Zalasky Aff., Ex. C at 79.) Plaintiff testified that she saw the press release before

it was issued and she never contacted the newspaper to ask them to print a retraction of the press

release. (Zalasky Aff. Ex. C at 75-76; 85-86.)

**A.     The Evidence on Record Concerning Defendant Klas' Statements**

     Klas testified that the first time he heard that a lie detector test was administered to Harris

was when he received the December 9, 2003, letter from Harris and the two other employees.

(Regnier Aff. Ex. 6 at 73.) Klas denies ever telling anyone that Harris failed a lie detector test and

he testified that no one ever told him that Harris failed the CVSA or that she was involved in the

theft of funds while she was employed at the VFW. (Affidavit of William Mavity (hereinafter

7

"Mavity Aff.") Ex. P at 2-3; Zalasky Aff. Ex. F at 27-28.)  Klas denies telling members of the Board

that Harris was involved in the theft of funds while she was employed at the VFW and he also denies

telling the Board that the City would not provide funding for the NEC if the NEC continued to

employ Harris.  (Mavity Aff. Ex. P at 2.)  Klas stated that he "never said the City would not provide

funding . . . since [he] did not have the authority to make that decision."  (Mavity Aff. Ex. P at 2.)

Klas testified that Kruger did not share with him the results of Harris' CVSA or the results of the

interviews conducted with Harris by the Wabasha Police Department.  (Mavity Aff. Ex. D at 36.)

Klas testified that Kruger told him in December 2003 that three employees were given the CVSA

and that the employees were given the results of the test.  (Zalasky Aff. Ex. F at 30-32.)  Klas

testified that this was the sole conversation he had with Kruger concerning Harris.  (Zalasky Aff.

Ex. F at 32.)

        Klas testified that he did not tell Lineweaver that Harris had not passed the CVSA.  (Mavity

Aff. Ex. D at 44.)  Klas testified that he did not tell City Council member Joel Carlson (hereinafter

"Carlson") that Harris had taken a lie detector test, that she failed that test, or that she had problems

at the VFW because of some improprieties.  (Mavity Aff. Ex. D at 50.)  Klas also denied ever telling

Council Member Catherine Gallenberger (hereinafter "Gallenberger") that there were some

problems when Harris was working for the American Legion, that they were missing some funds

at the Legion or that Harris was let go.  (Mavity Aff. Ex. D at 52.)[3]

        Lineweaver testified that sometime in 2004 he had a conversation with Klas regarding Harris

_____

        [3] Gallenberger testified that Klas came to her bakery in early 2005 and said "something to
the effect 'You know that there were some prior problems when Sue Harris was working at the
American Legion, they had some missing funds and then she was let go.'" (Mavity Aff. Ex. Q at
5-6; <u>see also</u> Ex. E at 14-16.)

8

and her involvement in the NEC.  (Mavity Aff. Ex. Q at 3.)  Lineweaver testified that he did not remember the exact words that Klas used in their conversation, but that Klas verified that Harris had been given a lie detector test, she had been given the results of the test, that Klas, "at least by implication" verified that Harris had failed her lie detector test, and that her failure of the test was the reason that Harris was asked to take a second lie detector test.  (Mavity Aff. Ex. G at 14-15.)

Carlson testified that Klas told him that Harris failed the CVSA test.  (Mavity Aff. Ex. F at 22.)  Carlson testified that Klas insisted that Harris take a second lie detector test before the Board considered re-hiring her.  (Mavity Aff. Ex. F at 23.)  Carlson testified that Klas commented that "there had been questions raised about [Harris] from her time at the VFW and – around money issues."  (Mavity Aff. Ex. F at 38.)  Carlson testified that Klas never said Harris took money.  (Mavity Aff. Ex. F at 38.) Carlson stated in his interrogatory answers that Klas "said something to the effect, 'as long as the City is supplying the money, Sue Harris will not work there.'"  (Regnier Aff. Ex. 14 at 5.)  In 2004 Craig Falkum (hereinafter "Falkum") was the Vice-President of the Board.  Falkum testified that he attended the March 8, 2004, closed meeting of the Board and heard Klas say that Harris failed the lie detector test.  (Mavity Aff. Ex. B at 28.)

EagleWatch President Stokes was asked whether any of the things Klas said at the March 8, 2004, Board meeting were said because Klas had personal animosity towards Harris "or more because he was concerned about the survival of the center" and Stokes testified that he "couldn't really understand . . . the reasons for any dislike or apprehension as to Sue Harris."  (Mavity Aff. Ex. A at 107.)  Stokes was asked "[Klas] never expressed to you any personal animosity towards [Harris]?" and Stokes responded "[w]ell, somewhat, but didn't identify why."  (Mavity Aff. Ex. A at 107.)

At her deposition concerning these matters, Garrigan was asked if she observed "anything in Mr. Klas' behavior in 2004 that would lead [her] to believe that . . . the actions [Klas] took or the statements he made were done with ill will or in bad faith or with malice" and Garrigan responded: "if you're defining malice and – you know, as anger and upset and emotion, yes, I – yeah, he definitely showed that in terms of having her take this polygraph test in order to be hired when we had that discussion at the June 14 meeting."  (Mavity Aff. Ex. C at 470.)

Robert Snitgen is a volunteer at the NEC who was elected to the Board and attended his first meeting on March 8, 2004.  (Mavity Aff. Ex. H at 30.)  Mr. Snitgen testified that at the closed portion of the March 8, 2004, meeting Klas told the Board that Harris did not pass the lie detector test and that Klas "insinuated" that Harris was involved in misappropriating funds from the VFW.  (Mavity Aff. Ex. I at 172; see also Ex. I at 130.)  Snitgen further testified that, at some point after the March 8, 2004, meeting, Klas stated that City funds would not be given to the NEC as long as Harris was employed there.  (Mavity Aff. Ex. I at 187.)  Elizabeth Snitgen testified that she attended Board meetings in June and July of 2004.  Ms. Snitgen testified that at the July meeting Klas stated "the City will not give you any more money if you rehire Sue Harris."  (Mavity Aff. Ex. M at 80.)  Ms. Snitgen, in a sworn affidavit, also stated that, during one of the Board meetings she attended in the summer of 2004, the Board was discussing whether Harris should be rehired and Klas stated "We don't need anyone in here we can't trust and who is suspected of being a thief."  (Mavity Aff. Ex. L ¶ 6.)  In a sworn affidavit William Cournoyer stated that he was also at a Board meeting in the summer of 2004 where the topic of re-hiring Harris was discussed, and that Klas stated "[w]e're not going to hire a thief."  (Mavity Aff. Ex. T ¶4.)

Plaintiff testified that Klas' statements caused her to lose her job at the NEC, and that she

10

experienced emotional distress due to the fact that she lost her job, but that she never sought, nor did anyone recommend that she seek, medical treatment for any emotional problems. (Zalasky Aff. Ex. C at 122-23.)

**B.   The Evidence on Record Concerning Defendant Kruger's Statements**

Kruger testified that he did not tell Klas the actual results of the CVSA test but, rather, told him that "the results would indicate that the investigation need[ed] to continue." (Mavity Aff. Ex. O at 240.) Kruger testified that he had conversations with Klas about information in the criminal investigative file that he considered to be confidential and nonpublic data because he believed that Klas was a victim of the crime. (Mavity Aff. Ex. O at 240.) Kruger testified that he believed that Klas was a victim of the crime "[b]ecause he's the mayor . . . and the city was partially funding the Eagle Center. So I felt that that money that was taken was also a part of the city's, and the mayor is in charge of the city." (Mavity Aff. Ex. O at 241.) Kruger testified that he also talked to Lineweaver and Gallenberger individually apart from a City Council meeting about the burglary investigation. (Mavity Aff. Ex. O at 246.) Kruger testified that he believed he told Gallenberger that "Harris admitted to taking some shirts from . . . the Eagle Center without paying for them." (Mavity Aff. Ex. O at 246-47.)

Lineweaver testified that, after receiving the December 17, 2003, letter from Harris and the other two suspected employees, he had a conversation with Kruger because the letter stated that the employees had not been given the results of the CVSA but at the same time the letter stated that the employees were vindicated by the undisclosed results. (Mavity Aff. Ex. G at 15.) Lineweaver testified that Kruger verified "at least by implication" that Harris failed the lie detector test, and that the employees had been given the results of the test. (Zalasky Aff. Ex. G at 14-15.) Gallenberger

testified that she had a conversation with Kruger in 2005 in which Kruger stated that Harris had not

passed the CVSA test.  (Mavity Aff. Ex. E at 21.)  Gallenberger further testified that Kruger told her

that Harris had admitted to taking things from the gift store.  (Mavity Aff. Ex. E at 22-23.)

Mary Murphy, the manager of the American Legion Club in Kellogg, stated in her affidavit

that on May 4, 2005, Kruger came into the Legion Club and told Ms. Murphy and her husband that

on April 29, 2005, Harris had failed an alcohol compliance check by serving alcohol to three people

under the age of 21.  (Mavity Aff. Ex. U. ¶7.)  In his Answer to the Amended Complaint, Kruger

admits that Ms. Murphy made a comment to him that an officer of the Wabasha Police Department

told her that Harris made an illegal sale of alcohol to a minor and that Kruger agreed with her

statement.  (Amend. Answer ¶XXVII.)

In her motion for partial summary judgment, Harris alleges that she is entitled to summary

judgment on the claims of defamation against Klas and Kruger.  Plaintiff alleges that the same

evidence that supports a finding of summary judgment on the defamation claim also supports a

finding of summary judgment on her claims for malicious wrong against Klas and her claim of

negligent infliction of emotional distress.  Plaintiff further alleges that she is entitled to summary

judgment against the City on her claim of violations of the Government Data Practices Act.

In his motion for summary judgment, Klas argues, *inter alia*, that the alleged statements he

made are protected by absolute privilege, and hence Count I should be dismissed.  Klas further

argues that Plaintiff has failed to sufficiently demonstrate that she manifested the phsyical symptoms

required to satisfy the elements of a claim for intentional infliction of emotional distress or negligent

infliction of emotional distress.  Klas also argues that Plaintiff cannot establish sufficient facts to

support a claim against him for malicious wrong.  Klas argues that, due to these deficiencies, his

12

motion for summary judgment should be granted.

Kruger and the City argue that their motion for summary judgment should be granted as to Plaintiff's claim for intentional and/or negligent infliction of emotional distress because there is no evidence to support this claim. The City further argues that there is no evidence to support the claim in Count II for malicious wrong. The City also argues that there is no basis for a claim against it for a violation of the Minnesota Government Data Practices Act. Kruger and the City further argue that the claim of defamation against Kruger must be dismissed because the statements Kruger made to Lineweaver and Gallenberger were true, they are protected by qualified privilege, and Plaintiff has failed to show actual harm to her reputation as a result of the alleged false statements. Finally, the City argues that, since the claims against both Kruger and Klas should be dismissed, there is no basis for a claim of vicarious liability against the City.

## II.   STANDARD OF REVIEW

According to Federal Rule of Civil Procedure Rule 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In order to determine whether a certain fact is material, " it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248 (1986). Summary judgment will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The inquiry performed is the threshold inquiry of determining whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be

13

resolved in favor of either party."  Id. at 250.

When determining whether to grant a motion for summary judgment, a court must view all of the facts in the light most favorable to the non-moving party and give the non-moving party the benefit of all reasonable inferences that can be drawn from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  When the moving party brings forth a proper summary judgment motion, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ.P. 56(e); see Anderson, 477 U.S. at 256 ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c).")

### III.   LEGAL ANALYSIS

**A.   Klas' Motion for Summary Judgment Should be Granted as to Counts I and III and Denied as to Count II.**

**1.   Assuming that Klas made the statements alleged in the amended complaint, those statements are protected by absolute privilege.**

Assuming without deciding that Klas made the statements alleged in the amended complaint, and that those statements are defamatory, Klas is protected from a defamation suit by Plaintiff based on the doctrine of absolute privilege.

The doctrine of absolute privilege was first discussed in Johnson v. Dirkswager, where the Minnesota Supreme Court noted that

> it would seem government can best be held accountable by assuring that its top-level representatives have no excuse not to speak out in the performance of their duties. If they speak out falsely and from ill motives, it is expected that their remarks will be exposed for what they are worth.   It seems to us that the same policy considerations that warrant an absolute privilege for those in the legislative and judicial branches of government apply to the executive branch.

315 N.W.2d 215, 221 (Minn.1982).  Twelve years later the Minnesota Supreme Court noted that "[t]here is now considerable agreement among state courts that 'high level' executive officers have absolute immunity from suit for defamatory statements made in the course of their duties." Carradine v. State, 511 N.W.2d 733, 735 (Minn.1994).  In Carradine the Minnesota Supreme Court stated that "[w]hether an executive officer is absolutely immune from defamation liability depends on many factors, including the nature of the function assigned to the officer and the relationship of the statements to the performance of that function."  Id. at 736.

"Absolute immunity protects officials who make statements which are integral to the performance of their assigned duties and which address issues of public concern . . . The availability of absolute immunity does not depend upon the statement's truth or the speaker's intent." Diver v. Peterson, 524 N.W.2d 288, 291 (Minn.App.1994) (citing Johnson v. Dirkswager, 315 N.W.2d at 220-21.)  The Minnesota Court of Appeals noted that "[t]he rationale underpinning absolute immunity is that the common good is promoted by allowing government officials to fearlessly provide and discuss information that concerns the public interest."  Id.

In the present case, the City is heavily involved with the NEC, as the City has guaranteed to provide any operating costs exceeding the revenue of the NEC.  In addition, the City, through the EDA, agreed to give the NEC $100,000.  These facts demonstrate that the City had a clear financial interest in the operation and management of the NEC.  As the Mayor of the City, Klas is the head executive official in the City.  As the Mayor, Klas had a responsibility to oversee the actions of the

NEC to ensure that the City's investment in the NEC was protected.  After the Resolution was signed, Klas started attending Board meetings on behalf of the City to monitor the management of the NEC and to protect the City's interests in the NEC.   All of the statements that Plaintiff alleges that Klas made were made in connection with Klas' duty as the Mayor to protect the City's financial interest in the NEC.  All of the alleged statements were made either at Board meetings or to City Council members, who also had a duty to protect the City's financial interest in the NEC.  Looking at the nature of the financial oversight function assigned to the Mayor, and the fact that all of the alleged statements are directly connected to the performance of that function, the Court recommends that Count I be dismissed as to Klas on the grounds that Klas is protected from defamation suit by virtue of absolute privilege.

> **2.**     **Plaintiff has not sufficiently alleged facts to support a claim for intentional or negligent infliction of emotional distress.**
>
>> **a.**     **There are no genuine issues of material fact regarding Plaintiff's claim against Klas for intentional infliction of emotional distress.**

There are four elements to a claim for intentional infliction of emotional distress: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe."  Langeslag v. KYMN, Inc., 664 N.W.2d 860, 864 (Minn.2003) (citing Hubbard v. United Press International, Inc., 330 N.W.2d 428, 438-39 (Minn.1983)).  The Minnesota Supreme Court noted that in "[e]xpounding the meaning of 'severe emotional distress,' the Restatement commentary says in part that '[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.'"  Hubbard, 330 N.W.2d at 439 (quoting Restatement (Second) of Torts § 46 comment j (1965)).

The record in this case does not provide the Court with any evidence to support Plaintiff's

claim of intentional infliction of emotional distress.  Plaintiff has not alleged facts that show that she

suffered from "severe emotional distress" as a result of the alleged statements by Klas.  Plaintiff

testified that Klas' statements caused her to lose her job at the NEC, and that she experienced

emotional distress due to the fact that she lost her job, but that she never sought medical treatment

for any emotional problems, nor had anyone ever recommended that she seek medical treatment for

her emotional problems.  (Zalasky Aff. Ex. C at 122-23.)  To the extent that Plaintiff experienced

emotional distress due to Klas' alleged statements, that emotional distress did not rise to the level

that is actionable under a claim for intentional infliction of emotional distress, and the Court

recommends that, insofar as Count III alleges a claim against Klas for intentional infliction of

emotional distress, Count III should be dismissed.

> **b.** **There are no genuine issues of material fact regarding Plaintiff's claim against Klas for negligent infliction of emotional distress.**

The Minnesota Supreme Court noted that "[t]o state a claim for NIED [negligent infliction

of emotional distress], a plaintiff must prove the elements of a negligence claim, as well as three

additional elements specific to NIED claims." Engler v. Illinois Farmers Insurance Co., 706 N.W.2d

764, 767 (Minn.2005).  The Minnesota Supreme Court noted that

> The four elements of negligence are: (1) the existence of a duty of care; (2) a breach of that duty; (3) an injury; and (4) the breach of the duty being the proximate cause of the injury . . . [i]n addition to the elements of negligence, a plaintiff claiming NIED must prove that she:  (1) was within the zone of danger of physical impact [created by the defendant's negligence]; (2) reasonably feared for her own safety; and (3) [consequently] suffered severe emotional distress with attendant physical manifestations.

Id. (internal citations and quotations omitted).

Plaintiff has not established the first four elements of negligence in the present case.  Plaintiff

has not alleged any facts supporting a claim that Klas had a duty of care to Harris, nor can Harris

establish that Klas breached that duty or that the breach of the duty was the proximate cause of her

injury.  Therefore, the Court recommends that Klas' motion for summary judgment be granted as

to Count III.

> **3.    There is a genuine issue of material fact as to whether Klas acted with malice or ill will towards Harris; therefore, Harris should be permitted to move forward with her claim for malicious wrong.**

The Minnesota Supreme Court discussed the difference between a claim for defamation and

a claim for malicious wrong as follows:

> 'If the words are not in their nature defamatory, that is, if they have not injured the reputation of any one, no action of libel or slander will lie, however maliciously they were published.  But if the defendant maliciously intended to injure the plaintiff by his words and succeeded in his malicious intent, and damage to the plaintiff was the direct result of the defendant's words, an action on the case will lie, whatever the nature of the words, provided that they are untrue.'

Marudas v. Odegard, 10 N.W.2d 233, 235 (Minn.1943)(quoting Odgers, Libel and Slander, 6th Ed.,

p. 65).  Therefore, "[a] claim for 'malicious wrong' is not simply coextensive with a defamation

claim . . . it can provide relief where a defamation claim fails."  Keckhafer v. Prudential Ins. Co. of

America, 2002 WL 31185866 *5 (D.Minn.2002).  Although Marudas "is old . . . it abides as a sound

statement of the law in Minnesota."  Id.  Therefore "where a plaintiff alleges that a defendant

maliciously intended to injure . . . her by communicating false words and has succeeded in that

malicious intent, and damage to the plaintiff is the direct result of the defendant's untrue words, a

claim exists under Minnesota law upon which relief can be granted."  Id.

In the present case there is a genuine issue of material fact as to whether Klas maliciously

intended to injure Harris by communicating false words and whether Harris was damaged as a direct

result of Klas' untrue words.  At his deposition Stokes was asked whether any of the things Klas said

at the March 8, 2004, Board meeting were said because Klas had personal animosity towards Harris

"or more because he was concerned about the survival of the center" and Stokes testified that he "couldn't really understand . . . the reasons for any dislike or apprehension as to Sue Harris." (Mavity Aff. Ex. A at 107.)   Stokes was asked "[Klas] never expressed to you any personal animosity towards [Harris]?" and Stokes responded "[w]ell, somewhat, but didn't identify why." (Mavity Aff. Ex. A at 107.)

In addition, at her deposition concerning these matters, Garrigan was asked if she observed "anything in Mr. Klas' behavior in 2004 that would lead [her] to believe that . . . the actions [Klas] took or the statements he made were done with ill will or in bad faith or with malice" and Garrigan responded: "if you're defining malice and – you know, as anger and upset and emotion, yes, I – yeah, he definitely showed that in terms of having her take this polygraph test in order to be hired when we had that discussion at the June 14 meeting."  (Mavity Aff. Ex. C at 470.)

Viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Klas made the alleged statements, whether those statements were made with malicious intent and whether those statements were false.  Therefore, the Court recommends that Klas' motion for summary judgment be denied as to Count II of the amended complaint.

**B.     Kruger's Motion for Summary Judgment Should be Granted.**

Harris alleges two claims against Kruger.   In Count I Harris alleges that "[o]n several occasions in 2004 and 2005 Kruger told City Council members that plaintiff had failed a lie detector test and made statements to Council member Gallenberger implying that when questioned about the NEC burglary, plaintiff admitted to stealing items from the NEC."  (Am. Compl. ¶ 30.)   Harris alleges that these statements were false and defamatory and tended to harm her reputation.  (Am. Compl. ¶ 30-33.)  In addition, in Count III Plaintiff alleges a claim for intentional and/or negligent

infliction of emotional distress against Kruger.

Plaintiff alleges in her memorandum in support of her motion for summary judgment that she alleged in her amended complaint that

> defendant Kruger told other persons that . . . plaintiff had been involved in 'missing funds' when she was an employee at the local VFW, and that on April 29, 2005, while working as a bartender at the American Legion Club in Kellogg, Minnesota, plaintiff sold alcoholic beverages to persons under the age of 21 years.  Plaintiff has alleged that all of these statements were false and defamatory.

(Pl.'s Mem. at 4.)   However, this statement is an inaccurate representation of the allegations contained in the amended complaint.  Nowhere within the amended complaint does Plaintiff allege that Kruger stated that she was involved in missing funds when she was an employee at the local VFW.  In addition, although Plaintiff relates the factual allegations concerning the accusation that Plaintiff sold underage persons alcohol while working at the American Legion Club in Kellogg, Minnesota, nowhere within her Amended Complaint does Plaintiff allege that these statements were false.[4]  (Am. Compl. ¶¶ 28-26.)  Therefore, Plaintiff has not successfully alleged a defamation claim against Kruger based on these two alleged statements, and the Court will not address these allegations.

### 1. Assuming without deciding that the alleged statements are defamatory, Kruger is protected from defamation liability by qualified privilege.

---

[4] In Count I of the Amended Complaint, Plaintiff states that she "realleges each foregoing allegations as if fully set forth hereunder."  (Am. Compl. Count I.)  Plaintiff argues that this statement is sufficient, under Rule 8 of the Federal Rules of Civil Procedure, to allege a defamation claim based on Kruger's statements to Murphy regarding the alleged illegal alcohol sale.  (Pl.'s Mem. in Opp. to Kruger's Summary Judgment Motion at 12-13.)  Federal Rule of Civil Procedure Rule 8 requires a plaintiff to provide, *inter alia*, " a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In the present case Plaintiff did not provide any statement of the claim that the statements made by Kruger to Murphy were false; therefore, Plaintiff has not satisfied Rule 8, notwithstanding the fact that she re-alleged all the foregoing allegations under Count I.

In the amended complaint Plaintiff alleges that "On several occasions in 2004 and 2005 Kruger told City Council members that Plaintiff had failed the lie detector test and made statements to Council member Gallenberger implying that when questioned about the NEC burglary, plaintiff admitted to stealing items from the NEC." (Am. Compl. ¶ 30.) Plaintiff alleges that these statements were false and defamatory, tended to harm her reputation, accused Plaintiff, indirectly or directly, of committing a crime and are therefore defamatory *per se*, that those statements were made negligently, in bad faith and with malice, and that, as a result of those statements, Harris suffered substantial emotional harm and distress and economic harm. (Am. Compl. ¶¶ 31-35.)

Assuming without deciding that the alleged statements are defamatory, Kruger argues that he is protected from liability by conditional, or qualified, privilege. In Minnesota, the law of qualified privilege is that

> 'a communication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. When so made in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel. Actual malice must be proved, before there can be a recovery, and in the absence of such proof the plaintiff cannot recover.'

Stuempges, 297 N.W.2d at 256-57 (quoting Hebner v. Great Northern Railway, 80 N.W. 1128, 1129 (1899)).

In the present case the statements Kruger made to Lineweaver and Gallenberger were made upon a proper occasion, from a proper motive and were based on probable cause. The statements Kruger made to Lineweaver were made in response to an inquiry of Lineweaver's that arose from the statements Plaintiff made in her December 17, 2003, letter. At the time Lineweaver was the president of the City Council, and the City Council had a financial relationship with the NEC wherein the City Council agreed, by Resolution, to fund the NEC in the event that the NEC's costs

21

exceeded its revenue. Lineweaver had an interest, as a member of the City Council, in the investigation of the burglary at the NEC, and therefore Kruger's response to his request for information was made on a proper occasion and for a proper purpose. The statement was based on probable cause to believe that Plaintiff failed the CVSA test, as Kruger had firsthand knowledge that the CVSA indicated that Plaintiff was being deceitful when asked questions surrounding the burglary.

In addition, Gallenberger was also a member of the City Council when Kruger made the alleged statements to Gallenberger. Gallenberger spoke to Kruger about the investigation in her role as a City Council person, and Kruger responded to these inquiries. Therefore, Kruger's statements to Gallenberger were made upon a proper occasion and for a proper motive. These statements were also based on probable cause, as Kruger had firsthand knowledge of the CVSA results and firsthand knowledge of the statements Harris made during her interrogation that she took items from the NEC gift store without paying for them. Kruger's statements meet the threshold of qualified privilege, and to override that privilege Plaintiff must prove that the statements were made with actual malice.

Plaintiff has not come forward with any evidence to support a claim that Kruger made the alleged statements with actual malice. Therefore, there is not a genuine issue of material fact as to whether Kruger acted with malice when he made these statements to Lineweaver and Gallenberger, and the Court recommends that Kruger's Motion for summary judgment be granted with respect to Count I on the grounds that Kruger is entitled to qualified privilege.

> **3.     There are no genuine issues of material fact regarding Plaintiff's claims for intentional and/or negligent infliction of emotional distress.**
>
> > **a.     There are no genuine issues of material fact regarding Plaintiff's claims for intentional infliction of emotional distress.**

CASE 0:05-cv-00645-JMR-FLN   Document 111   Filed 09/25/06   Page 23 of 27

There are four elements to a claim for intentional infliction of emotional distress: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe."  Langeslag, 664 N.W.2d at 864 (Minn.2003) (citing Hubbard, Inc., 330 N.W.2d at 438-39 (Minn.1983)).  The Minnesota Supreme Court noted that in "[e]xpounding the meaning of 'severe emotional distress,' the Restatement commentary says in part that '[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.'"  Hubbard, 330 N.W.2d at 439 (quoting Restatement (Second) of Torts § 46 comment j (1965)).

The record in this case does not provide the Court with any evidence to support Plaintiff's claim of intentional infliction of emotional distress.  Plaintiff has not alleged facts that show that she suffered from "severe emotional distress" as a result of the alleged statements by Kruger.  Therefore, the Court recommends that, insofar as Count III alleges a claim against Kruger for intentional infliction of emotional distress, Count III should be dismissed.

> **b.**    **There are no genuine issues of material fact regarding Plaintiff's claim against Klas for negligent infliction of emotional distress.**

"[T]o state a claim for NIED [negligent infliction of emotional distress], a plaintiff must prove the elements of a negligence claim, as well as three additional elements specific to NIED claims."  Engler v. Illinois Farmers Insurance Co., 706 N.W.2d  764, 767 (Minn.2005).  The Minnesota Supreme Court noted that

> The four elements of negligence are: (1) the existence of a duty of care; (2) a breach of that duty; (3) an injury; and (4) the breach of the duty being the proximate cause of the injury . . . [i]n addition to the elements of negligence, a plaintiff claiming NIED must prove that she:  (1) was within the zone of danger of physical impact [created by the defendant's negligence]; (2) reasonably feared for her own safety; and (3) [consequently] suffered severe emotional distress with attendant physical manifestations.

23

Id. (internal citations and quotations omitted).

Plaintiff has not established the first four elements of negligence in the present case. Plaintiff has not alleged any facts supporting a claim that Kruger had a duty of care to Harris, nor can Harris establish that Kruger breached that duty or that the breach of the duty was the proximate cause of her injury. Therefore, the Court recommends that Kruger's motion for summary judgment be granted as to Count III.

**C.      The City's Motion for Summary Judgment Should be Granted in Part and Denied in part.**

In her amended complaint Harris alleges vicarious liability against the City in Count I for the alleged defamatory statements of Klas and Kruger. Harris further alleges a claim against the City in Count II for malicious wrong. Harris also alleges a claim against all Defendants, including the City, for intentional and/or negligent infliction of emotional distress in Count III. Finally, Harris alleges a claim against the City in Count VI for a violation of Minnesota Statute Section 13.82 based on the actions of Klas, in disclosing confidential and nonpublic criminal investigative data concerning Plaintiff.

**1.      Defendant's motion should be granted as to Count I and Count III because no basis for vicarious liability exists.**

As noted above, the Court recommends that Count I and Count III be dismissed as to Klas and Kruger. As the City's liability in Counts I and III is vicarious liability based on the actions of Klas and Kruger, and since the Court recommends that those claims be dismissed as to Klas and Kruger, there is no remaining basis for liability. Therefore, the Court recommends that Counts I and III be dismissed in their entirety.

**2.      Defendant's motion should be denied as to Count II and Count VI because there are genuine issues of material fact regarding these claims.**

24

As noted above, the Court recommends that Klas' motion for summary judgment be denied as to Count II, because there is a genuine issue of material fact as to whether Klas acted with malice or ill will towards Harris.  Since the City's liability in Count II is vicarious liability based on the actions of Klas and there is a genuine issue of material fact as to whether Klas acted with malice or ill will toward Harris, there is also a genuine issue of material fact as to whether the City is vicariously liable for Klas's alleged malicious actions.  As a genuine issue of material fact regarding the malice issue remains, the Court recommends that Defendant's motion for summary judgment be denied as to Count II.

> a.  **There is a genuine issue of material fact as to whether the City is liable to Plaintiff for violations of the Minnesota Government Data Practices Act.**

In her Amended Complaint, Plaintiff alleges that the "City, through the actions of its Mayor, . . . Klas, disclosed to others, including the Board . . . and other Wabasha City Council Members, confidential and nonpublic criminal investigative data, specifically, the results of the voice stress analysis testing of plaintiff by its police department."  (Am. Compl. ¶ 47.)

The Minnesota Government Data Practices Act (hereinafter "Act"), Minnesota Statute Section 13.01 *et. seq.* "regulates the collection, creation, storage, maintenance, dissemination, and access to government data in government entities."  Minn. Stat. § 13.01, subd. 3.  Minnesota Statute Section 13.82 states that "investigative data collected or created by a law enforcement agency in order to prepare a case against a person, whether known or unknown, for the commission of a crime . . . is confidential or protected nonpublic [data] while the investigation is active."  Minn. Stat. § 13.82, subd. 7.

In the present case it is clear that the content of the interrogation that occurred on December

25

8, 2003, the fact that Harris took the CVSA test, and the results of the CVSA test constitute "investigative data." The issue in this case is whether that investigative data was disclosed by Klas. As detailed in the fact section, there is conflicting testimony concerning whether Klas disclosed the investigative data to members of the City Council and the Board. Therefore, there is a genuine issue of material fact in the present case as to whether any of the investigative data was disclosed by Klas, and the Court recommends that Defendant's motion for summary judgment be denied with respect to Count VI.

## IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Partial Summary Judgment [#63] be **DENIED**.

2.    Defendant Peter Klas' Motion for Summary Judgment [#68] be **GRANTED in part** and **DENIED in part** as follows:

    a.    Insofar as the motion relates to Counts I and III, the motion should be **GRANTED**.

    b.    Insofar as the motion relates to Count II, the motion should be **DENIED**.

3.    Defendants City of Wabasha and David Kruger's Motion for Summary Judgment [#80] be **GRANTED in part** and **DENIED in part** as follows:

    a.    Insofar as the motion relates to Counts I and III, the motion should be **GRANTED**.

    b.    Insofar as the motion relates to Counts II and IV, the motion should be **DENIED**.

DATED: September 25, 2006          s/ *Franklin L. Noel*
                                FRANKLIN L. NOEL
                                United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **October 13, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **October 13, 2006,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.

27